IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

QUIYONTAY SANDERS,

      Defendant.

CRIMINAL ACTION

NO. 1:15-CR-250-LLM-CMS

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

On July 7, 2015, a Grand Jury sitting in the Northern District of Georgia returned a one-count indictment against Defendant Quiyontay Sanders for being a felon in possession of a firearm. (Doc. 1).

Before the Court is Defendant's Motion to Suppress Statements (Doc. 16) based on law enforcement's alleged failure to provide Defendant with <u>Miranda</u> warnings prior to interrogation.  Because there was no interrogation requiring <u>Miranda</u> warnings, I **RECOMMEND** that Defendant's Motion to Suppress Statements (Doc. 16) be **DENIED**.

Also before the Court is Defendant's Motion to Suppress Evidence (Doc. 17) in which Defendant argues that he was subjected to a search in violation of his

Fourth Amendment rights.  For the reasons stated below, I **RECOMMEND** that Defendant's Motion to Suppress Evidence (Doc. 17) also be **DENIED**.

## I.   BACKGROUND

On February 9, 2016, I conducted an evidentiary hearing on Defendant's motions.  (Doc. 24, Transcript ["Tr."]).  At the hearing, the Government presented as witnesses two members of United States Marshals Fugitive Task Force, Joshua Thompson and Craig Fries.  Defendant did not call any witnesses.

Defendant was paroled in December 2011 and was subject to "standard conditions" of parole.   (Tr. at 6).   The Government offered into evidence Defendant's Parole Certificate (Hearing Exhibit 1 ["Ex. 1"]) and the back side of the Parole Certificate titled "STANDARD CONDITIONS UNDER WHICH THIS PAROLE IS GRANTED" (Hearing Exhibit 2 ["Ex. 2"]). (Tr. at 6).

Standard Condition Number 2 provides:

2.  **Law/Immediate Notification/Searches**: I will not violate the law of any governmental unit.  I will immediately notify my parole officer if I am arrested for any offense, including a traffic offense.  My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control.

(Tr. at 7; Ex. 2).  The case notes and the Parole Certificate reflect that Defendant was provided with the Standard Conditions within 24 hours of his release from prison and that Defendant signed "all corresponding paperwork" relating to his

2

parole conditions and instructions.  (Hearing Exhibit 3 ["Ex. 3"]; Tr. at 8-10).[1]  The case notes and the Parole Certificate reflect that Defendant informed his parole officer that he would be residing with his mother, Lisa Sanders, at 2099 Martin Luther King, Jr. Drive, Apartment B-1, in Atlanta, Georgia.  (Tr. at 9, 10; Exs. 1, 3).

Agent Thompson testified that in April 2013, he was working with the Georgia Board of Pardons and Paroles as a criminal investigator assigned to the counter-gang unit of the United States Marshals Fugitive Task Force.  (Tr. at 4). At that time, he was assigned to serve an arrest warrant on Defendant based on a parole violation.  (Id. at 5).  The case was assigned to Agent Thompson because the underlying offence was a violent offense (aggravated assault) and because Defendant was a member of the Goodfellas gang.  (Id.).  Agent Thompson testified that in addition to being subject to arrest based on an alleged parole violation, Defendant was also one of the members of the Goodfellas gang that were wanted for questioning in connection with a homicide investigation.  (Id. at 11, 13, 22).

---

[1] The Government submitted the parole documents into evidence through the testimony of Agent Thompson, who testified that he did not prepare the case notes and had no personal knowledge as to whether Defendant was actually provided with the Standard Conditions.  (Tr. at 16).  The Standard Conditions has a place for the parolee to sign, but the document offered into evidence by the Government was not signed.  (Id.; Ex. 2).

Agent Thompson testified that in conducting his investigation, he went to Defendant's mother's home to serve the warrant, but Defendant was not there. Agent Thompson testified that Defendant's mother, Ms. Sanders, "basically said he wasn't living there," he was staying with his girlfriend, who she identified by the nickname "Shay." (Tr. at 19, 27). Agent Thompson also testified that he had been informed that Defendant had contacted his parole officer using a phone number belonging to Meanda Lewis, who he later determined was "Shay." (Id. at 18, 28). During the course of his work on the case, Agent Thompson developed information that Defendant was not staying at the address he had given to his parole officer, but rather was staying with Ms. Lewis at 3804 Martin Luther King, Jr. Drive, in Building 7, Apartment D-7. (Id. at 10, 18, 19).

On the morning of April 25, 2016, Agent Thompson conducted surveillance at Ms. Lewis's apartment complex and observed Defendant exiting Building 7 and walking to a dumpster. (Tr. at 10, 19). The officers confirmed with the building management that Meanda Lewis lived at Apartment D-7. (Id. at 10). That same day, the officers observed Defendant leave from outside Ms. Lewis's apartment in the back seat of a vehicle registered to Ms. Lewis's father. (Id. at 10, 19, 23).

The following day, Agent Thompson and seven or eight other task force members went to Ms. Lewis's apartment to serve the arrest warrant. (Id. at 10-12,

4

19, 32).  When they arrived, the officers knocked and announced their presence as police officers but got no response.  (Id. at 11).  They continued to knock and announce.  (Id.).  The officers heard dogs barking, and one of the task force officers could see the dogs through the back sliding glass doors.  (Id. at 19-20). That officer did not report seeing any persons inside the apartment.  (Id. at 11, 20). Agent Thompson showed Defendant's picture to a neighbor, who confirmed that Defendant was inside.  (Id. at 11, 20-21).  The officers then went back and continued to knock and called out Ms. Lewis and Defendant by name.  (Id.). Thereafter, the dogs stopped barking and the officer in the back of the apartment reported that he saw the dogs run up the stairs.  (Id.).

At that point, Ms. Lewis came to the window and said she was coming down.  (Tr. at 11, 21).  She then opened the door.  Agent Thompson asked if Defendant was inside and told her he had a warrant for his arrest.  (Id.).  In response, Ms. Lewis stated that she did not want to go to jail.  (Id. at 12). Defendant then came down the stairs, and Agent Thompson arrested him without incident.  (Id. at 12, 21-22).  The dogs did not come downstairs, and the officers learned that the dogs had been put into a room.  (Id. at 21).

After arresting Defendant, Agent Thompson asked Ms. Lewis if anyone else was in the apartment, and she said no.  (Tr. at 13, 22).  Nevertheless, the officers

conducted a "protective sweep" of the apartment.  Agent Thompson testified that

the officers conducted the protective sweep because he was concerned that other

people might be in the apartment.  (Id. at 13).  He testified that he conducted the

protective sweep in part because Defendant was "constantly" in contact with

certain other gang members who were suspects in the same homicide about which

Defendant was wanted for questioning:

> My ten years experience in doing fugitive and gangs in addition to
> intelligence we had from social media sites and crime stopper tips that
> Mr. Sanders was constantly in contact and associating with several of
> these – several other of these wanted gang members, so we asked Ms.
> Lewis if there was anybody else inside the residence.  She stated no.
> However, I was not convinced of her answer given my ten plus years
> of experience that many times people are afraid to tell the truth that
> there's somebody else in there even though we had arrested Mr.
> Sanders who was our initial arrestee.  So for our safety because the
> window upstairs where Ms. Lewis came from looked down to where
> the other officers were and knowing that Mr. Sanders was constantly
> in contact with these other gang members, we continued to conduct a
> protective sweep of the downstairs. . . .

> [My purpose in going to Ms. Lewis's home that day] was to arrest Mr.
> Sanders.   In my experience of ten years doing fugitives and
> specifically gang members, usually where we arrest one gang member
> we will find others, or we find other people hiding because the police
> are there, and they're usually not even wanted sometimes.  So in that
> we knew Mr. Sanders was very close with these individuals and that
> we know that they had been spending time, you know, late evenings,
> early mornings together, basically 24-hours a day that we were told he
> was with them. When he was not with other gang members, he was
> with these specific people.  One of them, one of them specifically I'm
> trying to recall his name because he had a nickname, but when we

were there and arrested him, hearing movement upstairs probably was
the dogs, but at the time we could not confirm that.

(Tr. at 13, 23).

Agent Thompson then asked Ms. Lewis to go upstairs with him to secure the

dogs, which she did.  (Tr. at 13)..  Upstairs, there were two bedrooms.  One was

empty, and the other room contained a large "bed of bedding" which Agent

Thompson described as approximately five or six comforters positioned directly on

the floor (not on a bed frame or platform) with another five or six comforters or

sheets in a ball.  (Id. at 14, 24, 25).  That room looked "lived in" with male and

female clothing items.  (Id. at 14)  Agent Thompson testified that someone could

hide in the "bed of bedding."  (Id. at 14, 25).  Task force agent Monet then used his

foot to move the bedding "to ensure that there was no one under there" and

discovered a firearm.  (Id. at 14, 25).  Agent Thompson asked Ms. Lewis if the gun

was hers, and she said no.  (Id. at 14).  Among the items found in the room was a

"Viking Life" sweatshirt, which is a music entertainment group associated with the

Goodfellas gang, and Defendant's cell phone.  (Id. at 14-15, 25-26).

After his arrest, Defendant was taken outside the apartment.  (Tr. at 22, 26).

At some point Defendant was placed in an Atlanta Police car.  (Id. at 26).  After

Defendant learned that the officers had found a gun, Defendant began yelling

obscenities and "making statements that he was going to get his girl to take the gun." (Id.).

The Government also called Special Agent Craig Fries, an ATF agent who, at the relevant time, was working as a detective with the Atlanta Police Department and served on the U.S. Marshals Fugitive Task Force. (Tr. at 29-30). Agent Fries was present at Ms. Lewis's apartment during the arrest. Agent Fries testified that Ms. Lewis consented to the search after Defendant was arrested, telling him to "go ahead" in response to his request to check for any additional persons. (Id. at 33). Agent Fries also testified that while Defendant was outside of Ms. Lewis's apartment, Defendant allegedly "made a statement to us saying he claimed possession of the firearm. He said it did not belong to his girlfriend, Ms. Lewis, and he claimed possession of it." (Id. at 35). Defendant also allegedly stated "my fingerprints are on it." (Id. at 36). Agent Fries went on to testify that when Defendant was getting into the transport vehicle, Defendant then stated that the gun belonged to his girlfriend. (Id.). Agent Fries testified that he had not asked Defendant any questions; his job was not to question Defendant, but rather to transport him to the homicide department. (Id. at 36-37).

At the conclusion of the evidentiary hearing, defense counsel conceded that there was no interrogation requiring <u>Miranda</u> warnings (Tr. at 40-41), which essentially mooted the Motion to Suppress Statements (Doc. 16).

## II.   DISCUSSION

In Defendant's Motion to Suppress Evidence (Doc. 17), Defendant argues that both the gun and post-arrest statements should be suppressed because they are "fruit of the poisonous tree."  According to Defendant, he would not have made the statements and the gun would not have been recovered but for the search, which he contends was illegal.

The Government argues that there are three independent reasons why the search was proper.  First, the Government argues that as a parolee, Defendant lacked a reasonable expectation of privacy and had expressly agreed to warrantless searches without condition.  (Doc. 31 at 5-8).  Second, the Government argues that law enforcement was entitled to conduct the protective sweep incident to Defendant's arrest.  (<u>Id.</u> at 8-10).  Third, the Government argues that Ms. Lewis consented to the search. (<u>Id.</u> at 10-14).  I will address these arguments in turn.

### A.   Defendant's status as a parolee

Standard Condition 2 of Defendant's parole provides, in relevant part: "My parole officer or any other parole officer may, at any time, conduct a warrantless

9

search of my person, papers, and place of residence, automobile, or any other property under my control." (Ex. 2).   The Government cites to the United States Supreme Court decision in Samson v. California, 547 U.S. 843, 126 S. Ct. 2193 (2006), for the proposition that the Fourth Amendment is not violated by a search of a parolee who agrees in writing to be subject to search and seizure at any time without a warrant. (Doc. 31 at 5).   Defendant responds that Condition 2 of the Standard Conditions of his parole did not extend to Ms. Lewis's house, where he was simply a "social guest."   (Doc. 28 at 7-11; Doc. 32 at 1-4).   According to Defendant, his parole status allowed a search only of his ***residence***, and there is insufficient evidence in the record to demonstrate that Ms. Lewis's apartment was Defendant's residence.

The record clearly reflects that Defendant was staying with Ms. Lewis on an overnight basis at the time of the search.   Defendant's mother told the agents that Defendant was not living with her and indicated that he was with "Shay," who was determined to be Defendant's girlfriend, Ms. Lewis. (Tr. at 27-28).   The officers' surveillance and conversation with the neighbor confirmed this fact. (Id. at 10-11, 19-21).   Moreover, Defendant's personal belongings, including his cell phone, were located in one of the bedrooms.   Defendant argues that the surveillance establishing that Defendant was staying with Ms. Lewis lasted for only one day,

10

and he points out that there was no evidence presented that there was any mail addressed to him, that any of his belongings were stored in drawers in the apartment, that he had a key to the apartment, or that he was on the lease of the apartment.  (Doc. 32 at 3).

Defendant's argument about Ms. Lewis's apartment not being his residence rings hollow.  It is undisputed that Defendant was not living with his mother at the address at which he told his parole officer he would be living, meaning that he was in violation of his parole condition prohibiting Defendant from changing his residence without first getting permission from his parole officer.   (Ex. 2, Condition 4).  Defendant cannot violate this condition of his parole by changing his residence and then hide behind that fact to avoid being subjected to warrantless searches of the place where he resides.  While the record does not reflect how long Defendant had been staying with Ms. Lewis, it is clear that he was staying with her for at least one day before the search took place, and no other location was identified or even suggested to be his residence.  And as for the arguable lack of evidence regarding mail, other property stored in drawers, a key, or being on the lease, Defendant has cited no law indicating that such evidence is necessary for the search provision in the Standard Conditions to apply.

Moreover, the Supreme Court has held that parolees like Defendant have fewer expectations of privacy than other people, even fewer than people on probation. See Samson, 547 U.S. at 848, 126 S. Ct. at 2197 (noting that given the conditions of parole, such as mandatory drug tests and residence approval, "parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone."). The Supreme Court highlighted the State's significant interest in combating recidivism among parolees and promoting reintegration into society through the law enforcement tool of suspicionless searches. Id. at 853-55, 126 S. Ct. at 2200-01.

Under the circumstances presented in this case, I agree with the Government that due to Defendant's status as a parolee and his express agreement to searches as a condition of his parole, he lacked a reasonable expectation of privacy in the place where he slept—whether it was for one night or for one month. This is the necessary result, especially in light of the undisputed evidence that Defendant was not actually residing at his mother's house, where he was supposed to be residing. Accordingly, I find that the search of the room where Defendant had been staying for at least one night prior to his arrest was lawful pursuant to the Standard Conditions of Defendant's parole and based on his status as a parolee. See United

States v. Stewart, 213 F. App'x 898, 899 (11th Cir. 2007) (unpublished) (upholding a suspicionless search of a parolee).

**B.     The protective sweep incident to arrest**

The Government next argues that even without Defendant's explicit agreement to be subject to search and seizure at any time without a warrant, the search was still valid because the Fourth Amendment permits law enforcement to conduct a "protective sweep" in conjunction with an in-home arrest.  The Supreme Court has described the "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990).  Such a sweep must be based on a reasonable belief—based on specific and articulable facts—that the area to be swept harbors an individual posing a danger to those on the arrest scene.  Id.   Defendant responds that there were no specific and articulable facts to support a belief that there was a danger to the officers on the scene, and even if there were such a basis, the agents exceeded the scope of what otherwise would be lawful when they searched upstairs and moved the bedding. (Doc. 28 at 11-15; Doc. 32 at 5-10).

Here, the evidence supports the Government's position that the facts and circumstances known to the officers arresting Defendant supported the officers' decision to conduct a protective sweep of the apartment, which led to the discovery

14

of the gun.  The officers arresting Defendant knew that he was a member of the criminal gang Goodfellas and that he and other members of the Goodfellas gang were wanted for questioning in connection with a homicide.  (Tr. at 5, 11, 13, 22). Upon arriving at the apartment, the officers knocked and announced their presence several times before Ms. Lewis finally came down and answered the door.  (Id. at 11).  The agents knew that Defendant was constantly in contact with, and associated with, several other gang members who were suspects in the same homicide in which Defendant was wanted for questioning. (Id. at 13, 23).  Based on his years of experience and training in how gangs operate, Agent Thompson was not convinced that the apartment was otherwise empty.  (Id. at 13).  His concern was elevated by fact that Ms. Lewis had called out from an upstairs window before coming downstairs to answer the door and that he heard movement upstairs.  (Id. at 13, 23).

Moreover, there is nothing to indicate that the agents exceeded the scope of their protective sweep.  The undisputed testimony is that both Ms. Lewis and Defendant had been upstairs when law enforcement arrived and that Agent Thompson heard movement upstairs, making it reasonable to extend the sweep to the upstairs floor of the apartment.  (Tr. at 11-12, 21-23).  It is also undisputed that inside the upstairs bedroom, there was a pile of blankets, comforters, and sheets on

15

the floor big enough for someone to be hiding under, and Agent Monet used his foot to check for people hiding underneath. (Id. at 14, 23-25).  Although it turned out that the bedding was hiding only a gun—and not a person—there is nothing in the record to indicate that the officers had any motive other than to verify that no one was hiding under the bedding.  Given the delay in answering the door, the intelligence about Defendant being in constant contact with other gang members and suspects in a homicide investigation, and Agent Thompson hearing movement upstairs, the protective sweep was authorized.   See United States v. Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991) (finding a protective sweep was authorized where there were three vehicles on the scene and one person lied about the presence of another person in the house clearly gave rise to a reasonable belief that someone else could be hiding in the house).  Accordingly, I find that the search of Ms. Lewis's apartment was done as part of a lawful protective sweep incident to arrest, and was appropriately limited to a search for persons.

### C.   Consent

Finally, the Government argues that even if Defendant's parole conditions did not authorize the search, and even if there was no basis for a "protective sweep" incident to arrest, the search was nevertheless lawful because Ms. Lewis consented to it.  (Doc. 31 at 10-13).  Defendant does not seriously dispute the fact

that Ms. Lewis consented to a search of her apartment, but rather argues that to the extent she consented, such consent was limited to a search for persons, and the officers exceeded the scope of the consent. (Doc. 28 at 15-19; Doc. 32 at 7). According to Defendant, it was not reasonable to move the bedding; a visual inspection would have been enough to determine that no one was hiding there. (Doc. 32 at 8) ("that an individual could have been hiding beneath the bedding, defies belief and is unreasonable").

Agent Thompson described the "bed of bedding" as "several comforters, probably five or six laid down, then on top of that was another five or six in a ball, somewhere where another person could hide."   (Tr. at 14).   I find that this testimony to be credible and sufficient to support the Government's position that moving the bedding was necessary to check for persons that might have been hiding in the apartment.   Accordingly, I find that the search of Ms. Lewis's apartment was done pursuant to her consent, and was appropriately limited to a search for persons.

### III.   CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Defendant's Motion to Suppress Statements (Doc. 16) and Motion to Suppress Evidence (Doc. 17) be **DENIED**.

17

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, this **CASE IS CERTIFIED READY FOR TRIAL**.

IT IS SO ORDERED, this 6th day of June, 2016.

CATHERINE M. SALINAS
United States Magistrate Judge